# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### Civil Action No: 5:25-cv-221

| | | |
|---|---|---|
| DR. CHRISTINE MCPHAIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | (Jury Trial Demanded) |
| | ) | |
| SAINT AUGUSTINE'S UNIVERSITY, | ) | |
| JAMES PERRY, in his individual capacity, | ) | |
| BRIAN BOULWARE, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Dr. Christine McPhail brings this Complaint against the above-captioned Defendants.

## PARTIES, JURISDICTION AND VENUE

1. Dr. McPhail is a citizen of the State of North Carolina and resides within the Eastern District of North Carolina. She is a widow and the former President of Saint Augustine's University ("SAU"). Dr. McPhail's deceased husband also served as SAU's President.

2. SAU is a historically-black college. Located in Wake County, North Carolina, the University is governed by a Board of Trustees ("Board").

3. Defendant James Perry is, on information and belief, a resident of the State of Florida. Mr. Perry was the Chair of SAU's Board during the relevant time-period.

4. Defendant Brian Boulware is a resident of the State of North Carolina. He was a member of SAU's Board during the relevant time-period.

5. For the purpose of the acts and claims asserted herein, Dr. McPhail alleges that: (i) Defendants Perry and Boulware (collectively, "the Individual Defendants") acted individually and on their own respective behalf; outside the scope of their respective employment or association

with SAU; and/or otherwise without any legal justification for their actions; and (ii) the Individual Defendants' actions were not reasonably related to any legitimate business interest and otherwise exceeded the scope of their respective legal rights and authority.

6.     Alternatively, the Individual Defendants served as SAU's agents and within the scope of their employment or association with SAU concerning acts complained of herein.

7.     During the relevant time-period, the Individual Defendants possessed substantial control over Dr. McPhail's terms and conditions of employment.

8.     On information and belief: (i) the Individual Defendants performed their positions in a bad-faith manner designed to create fear and intimidation amongst SAU employees; (ii) based upon this abuse of individual power, the Individual Defendants unlawfully mistreated employees who report potentially unlawful conduct and/or refuse to engage in potentially unlawful conduct.

9.     Throughout Dr. McPhail's SAU employment: (i) the Individual Defendants collectively and individually fostered a personal, unjustified animus towards Dr. McPhail; and (ii) the Individual Defendants' personal animus towards Dr. McPhail intensified when she reported and/or refused to engage in potentially unlawful conduct.

10.    This Court has jurisdiction over both the subject matter of this action and the parties.  Venue also is proper in this Court.

## FACTS

### I.     RELEVANT BACKGROUND ON DR. MCPHAIL

11.    Dr. McPhail commenced her higher education career over fifty years ago, in 1969. After obtaining a Doctor of Education in Higher and Post-Secondary Education and Administration from the University of Southern California, Dr. McPhail held various professorships and leadership posts at colleges and university across the United States, including Kansas State University, Morgan State University, Cypress College and Kings River College.

2

12.     SAU hired Dr. McPhail as its President after the former President (Dr. McPhail's husband, Irving McPhail) passed away from COVID-19 following three months on the job. SAU's Board offered her the position after what SAU described was "an extensive national search."

## II.     THE EMPLOYMENT CONTRACT BETWEEN SAU AND DR. MCPHAIL

13.     On February 22, 2023, SAU and Dr. McPhail entered into an employment agreement ("Employment Agreement" or "Agreement").

14.     The Employment Agreement's term was for four (4) years with an automatic one-year extension if no party otherwise terminated the Agreement. The Agreement also contemplates a renewal per the parties' mutual agreement.

## III.     DR. MCPHAIL'S ATTEMPTS TO IMMEDIATELY AND POSITIVELY IMPACT SAU'S PRECARIOUS CONDITION

15.     As soon as Dr. McPhail assumed the presidency, she set out to overhaul SAU's academic, financial, and reputational standing. She brought forth several improvements to SAU's academic offerings, including by promoting faculty development; supporting research opportunities; establishing a centralized student support services center; collaborating with academic deans to improve and modernize curricula; and supporting investments in technology to improve teaching.

16.     Dr. McPhail also spearheaded efforts to bolster SAU's overall operational functioning. This included promoting upgrades to campus facilities; creating an institutional research office to collect and report institutional data more accurately (previously, SAU had no formal way of collecting institutional data, which is an essential tool for garnering grant money); promoting initiatives to enhance recruitment, enrollment, student retention and graduation rates; upgrading the Public Health Education Center; enhancing employee and alumni giving; and tripling SAU's grant acquisition from approximately $3 million dollars to over $10 million dollars.

3

17.     When fully considered, Dr. McPhail thoroughly modernized SAU's academic and operational abilities, as well as its external engagement and partnerships.

18.     Dr. McPhail also overhauled SAU's broken finance and compliance systems. When she assumed the presidency, SAU had thirteen violations with its accreditor, the Southern Association of Colleges and Schools Commission on Colleges ("SACSCOC"). SAU also had an outstanding deficit of over $3 million due to previous years of financial mismanagement. Moreover, audits from fiscal years 2020 and 2021 had yet to be filed due to the former administration's negligent recordkeeping. Indeed, when Dr. McPhail arrived, SAU had records for only approximately $137,000 of its approximately $34 million budget for FY2021.

19.     Dr. McPhail set to work righting the ship. After her first full year on the job, Dr. McPhail had successfully resolved twelve of the thirteen SACSCOC violations. The only remaining violations involved SAU's failure to file audits for FY2020 and FY2021 -- failures predating Dr. McPhail's tenure resulting from SAU's failure to maintain financial records.

20.     Dr. McPhail put together a team to forensically reconstruct SAU's finances for the two fiscal years preceding her appointment. In addition, she worked to institute sound financial practices and simultaneously prepare an audit for FY2022. Despite this gargantuan task, Dr. McPhail succeeded. SAU filed its FY2020 audit on March 16, 2022, and its FY2021 and FY2022 audits were nearly complete as of Dr. McPhail's wrongful termination in November 2023.

21.     Notwithstanding Dr. McPhail's accomplishments, and consistent with how it treated other Black female administrators, SAU's Board engaged in a pattern of discrimination and retaliation against Dr. McPhail.

4

## IV. SAU'S AND ITS BOARD'S HISTORY OF HOSTILITY TOWARDS BLACK FEMALE ADMINISTRATORS

22.    SAU's male-dominated Board of Trustees has long evinced hostility and a lack of professionalism towards Black female trustees and Black female SAU employees.

23.    Male trustees regularly directed their hostility towards Dr. McPhail, CFO Gwendolyn Kea, Vice President Dr. Carolyn Carter, Vice President of Economic Development Veronica Creech, as well as other Black female employees.

24.    For example, Trustee and then-Vice Board Chair Brian Boulware so berated Ms. Creech that she regularly had to excuse herself from Board meetings.

25.    The Board never treated male employees – including Chief of Staff John Smith, Provost Ricardo Phipps, Interim Athletic Director Stephen Latson, Dean Van Sapp and other male deans – in a similarly hostile and derogatory manner.

26.    The Board's hostile misconduct is also reflected in the Board's demographics and retention issues. At the start of Dr. McPhail's tenure, only *three* of the fifteen trustees were women. But even this illustratively low figure dropped: *two of the three female trustees -- both Black women -- resigned* in the last few months of Dr. McPhail's tenure, leaving only one (white) female board member who subsequently left the Board.

27.    Dr. McPhail was not surprised by these resignations. She observed the discriminatory way that male trustees treated the female trustees, often talking over them and dismissing their ideas without deliberation. By contrast, male trustees treated one another with respect and deference.

28.    The situation worsened when, in October 2023, the Board appointed Rufus Montgomery as a trustee. On information and belief, before joining SAU's Board, Mr. Montgomery reportedly faced accusations of trying to oust the Black female president of Florida

5

A&M University ("FAMU"), where he was the Chair of the Board of Trustees. Several lawmakers reportedly called for his resignation. Ultimately, Mr. Montgomery did reportedly resign.

29. Unfortunately, unlike at FAMU, SAU and its Board took the extreme measure of summarily terminating Dr. McPhail almost immediately after she complained of discrimination.

## V. SAU'S AND ITS BOARD'S UNLAWFUL CONDUCT TOWARDS DR. MCPHAIL

30. Throughout her SAU employment, the Board -- including Justice James Perry, then-Vice Chair Boulware, Hadley Evans, and later Mr. Montgomery – spoke to Dr. McPhail in hostile and demeaning tones while denigrating her work in a manner the trustees never directed at male employees.

31. When Dr. McPhail challenged this misconduct, the male trustees dismissed her concerns, claiming she needed to be *"less sensitive,"* and accusing Dr. McPhail of going *"in the gender direction."*

32. Moreover, then-Vice Chair Boulware, Mr. Perry, and other trustees were particularly hostile when other female employees and Dr. McPhail discussed SAU's finances. In addition to yelling at Dr. McPhail and Ms. Kea for merely providing insights, male trustees regularly dismissed their recommendations in favor of the opinions of other male trustees.

33. This discriminatory treatment reached a fever pitch on October 5, 2023 – the first official Board meeting since Mr. Montgomery's appointment.

34. During the October 5, 2023 meeting, Mr. Montgomery, along with Trustee Hadley Evans, spoke extremely disrespectfully to Dr. McPhail and Ms. Kea, to the point that Ms. Kea began to shake and cry. Mr. Montgomery yelled at Dr. McPhail and demanded that she answer a question. When Dr. McPhail understandably did not respond to this attack, Mr. Montgomery yelled, *"Woman, did you hear me speak?!* I demand you answer my question!" Incredulous at

Mr. Montgomery's blatantly hostile acts and concerned for Ms. Kea's well-being, Dr. McPhail suggested that the meeting be recessed.

35.     Mr. Montgomery's blatant disrespect towards Dr. McPhail did not stop.  During recess, Dr. McPhail approached Mr. Montgomery and reminded him of the Board's Rules of Engagement and professionalism expectations.  Nevertheless, Mr. Montgomery's aggression continued, as he yelled, "Who do you think you are?!  You're just an employee.  Get out of my face, employee!"  This outburst was witnessed by dozens of others in attendance.

36.     At that point, Chairman Perry approached Dr. McPhail and Mr. Montgomery, asking them to move to a more private area.  In response, Mr. Montgomery exploded, yelling, "Get your employee out of my face!"  Mr. Montgomery continued his petulant outbursts as he proceeded down the hallway, yelling in front of the around twenty members at the Board meeting, "You think you've got a president here? Not for long!"  These outrageous and discriminatory comments caused Dr. McPhail shame and embarrassment in front of an important set of colleagues, vendors and employees.

37.     Due to Mr. Montgomery's and Mr. Evans's misconduct, Ms. Kea submitted her resignation.

38.     Unfortunately, SAU's Board subsequently closed ranks around Mr. Montgomery. On October 6, 2023 (the day after Mr. Montgomery's outbursts), Board Chairman Perry called Dr. McPhail and said, "You just need to hurry up and get over that.  We've got business to take care of.  You've got to separate yourself from *that woman stuff.*"  In so remarking, Chairman Perry confirmed what was readily apparent at the October 5 meeting:  Mr. Montgomery and the Board treated Dr. McPhail and Ms. Kea (both Black women) with hostility that they would never have extended to a male employee.

## VI. SAU'S SWIFT RETALIATION AFTER DR. MCPHAIL ENGAGES IN PROTECTED ACTIVITY, CULMINATING WITH HER UNLAWFUL TERMINATION

39.     Following the events of October 5, 2023, Dr. McPhail had no choice but to submit a formal discrimination complaint.

40.     On October 9, 2023, Dr. McPhail submitted an internal complaint of discrimination and hostile work environment to then-Board Chair Perry and Trustee David Henson (Chairman of the Board Personnel Committee). The complaint noted, among other things, that Mr. Evans and Mr. Montgomery both behaved towards Dr. McPhail and Ms. Kea in a discriminatory, "offensive" and "demeaning" manner that created a "hostile environment." The complaint should have prompted an internal investigation and review. Instead, it elicited retaliation.

41.     In the ensuing weeks, several trustees threatened Dr. McPhail with termination, including then-Vice Chair Boulware. Further, the Board's Executive Committee, which included then-Board Chair Perry, resolved to recommend to the full Board that SAU terminate Dr. McPhail's employment.

42.     Moreover, on or about November 3, 2023, Trustee Montgomery, through counsel, sent Dr. McPhail a "cease and desist" letter, falsely alleging that Dr. McPhail had made "defamatory" statements in her October 9 internal discrimination complaint. This letter was sent on the same day that the Board met and recommended Dr. McPhail's unlawful termination.

43.     SAU's retaliation did not stop there. On November 6, 2023, Dr. McPhail's attorneys informed SAU that they represented her in her discrimination and retaliation claims against SAU.

44.     *The next day*, then-Vice Chair Boulware hounded Dr. McPhail with messages, and both he and Board Chair Perry directly confronted Dr. McPhail about her claims on a conference

call. Specifically, during that call occurring at or about 5:00 PM on November 7, 2023, Chair Perry and Vice Chair Boulware chastised Dr. McPhail for hiring counsel and indicated they would take adverse action against her because of her discrimination complaints.

45.     The conversation constituted illegal retaliation and was particularly inappropriate for Chair Perry, a former lawyer and judge, who appeared to know that Dr. McPhail was a represented party.

46.     On November 8, 2023, Dr. McPhail's legal counsel informed SAU counsel via email of Chair Perry's and Vice Chair Boulware's call and threats of retaliatory termination, and her counsel reiterated its prior instruction that SAU refrain from further retaliatory action.

47.     On November 9, 2023, Dr. McPhail's counsel responded to Mr. Montgomery's "cease and desist" letter, copying SAU counsel. In that letter, Dr. McPhail's attorneys again noted that they represented Dr. McPhail in her discrimination and retaliation claims; that Mr. Montgomery's "cease and desist" letter was an act of retaliation; and that any further adverse actions by SAU, the Board or individual trustees would be actionable as unlawful retaliation.

48.     Nevertheless, on Monday, November 13, 2023 -- within weeks of Dr. McPhail's internal complaint and within days of receiving three correspondences from Dr. McPhail's counsel – SAU's Board of Trustees voted to terminate Dr. McPhail's employment.

49.     The Board did not set Dr. McPhail's termination date at the November 13, 2023 meeting. In fact, despite having already resolved to terminate Dr. McPhail, SAU had her attend a SACSOC accreditation meeting as the University President on Friday, December 1, 2023.

50.     By letter dated November 22, 2023 to then-Board Chair Perry, the SAU National Alumni Association provided its support to Dr. McPhail, making clear that there was no legitimate or lawful reason to terminate Dr. McPhail as SAU's President.

51.     By letter dated December 3, 2023, SAU informed Dr. McPhail that her termination would be effective immediately.  Notably, the termination letter and attachment thereto contains false allegations, including that there was "just cause" to terminate Dr. McPhail.

52.     Following Dr. McPhail's unlawful termination, SAU replaced her with a much younger male individual as Interim President.

53.     As a direct result of SAU's and the Individual Defendants' unlawful conduct, Dr. McPhail has suffered substantial emotional and other distress.

54.     SAU's and the Individual Defendants' unlawful conduct, as alleged herein, was wanton, willful, intentional, malicious and/or taken in bad-faith.

55.     Dr. McPhail filed a timely charge of race, gender and age discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").  Thereafter, the EEOC issued a right to sue letter dated January 31, 2025, which is attached as Exhibit A.

### FIRST CLAIM FOR RELIEF
**(Race/Gender/Age Discrimination in Violation of Title VII and the ADEA)**
**(Against SAU)**

56.     The allegations in Paragraphs 1 through 55 are incorporated by reference.

57.     SAU was and is an "employer" within the meaning of Title VII of the 1964 Civil Rights Act ("Title VII") and the Age Discrimination in Employment Act ("ADEA").

58.     Dr. McPhail performed her job in a satisfactory manner at all relevant times.

59.     SAU took adverse employment actions against Dr. McPhail, including by terminating her employment, based upon her race, gender and/or age, in violation of Title VII and the ADEA.

60.     SAU's Title VII and ADEA violations were intentional, willful and malicious.

61.     As a direct and proximate cause of SAU's Title VII and ADEA violations, Dr.

McPhail has sustained substantial economic and non-economic damages.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of Title VII and the ADEA)
### (Against SAU)

62.     The allegations in Paragraphs 1 through 61 are incorporated by reference.

63.     Dr. McPhail performed her job in a satisfactory manner at all relevant times.

64.     Dr. McPhail engaged in protected activity under Title VII and the ADEA, including

as alleged herein.

65.     SAU took adverse employment actions against Dr. McPhail, including by

terminating her employment, based upon Title VII and ADEA protected activity.

66.     SAU's Title VII and ADEA retaliation was intentional, willful and malicious.

67.     As a direct and proximate cause of SAU's Title VII and ADEA retaliation, Dr.

McPhail has sustained substantial economic and non-economic damages.

## THIRD CLAIM FOR RELIEF
### (Wrongful Discharge in Violation of North Carolina Public Policy)
### (Against SAU)

68.     The allegations in paragraphs 1 through 67 are incorporated by reference.

69.     Dr. McPhail performed her job in a satisfactory manner at all relevant times.

70.     At all relevant times, Dr. McPhail was within the class of persons protected by N.C.

Gen. Stat. § 143-422.2 and/or other applicable law.

71.     It is the public policy of the State of North Carolina to protect and safeguard the

right and opportunity of all persons to seek, obtain and hold employment without discrimination

or abridgment on account of race, gender, age and/or protected conduct by employers that regularly

employ fifteen (15) or more employees.

11

72.     SAU terminated Dr. McPhail because of her race, gender, age and/or protected

conduct.

73.     Dr. McPhail suffered damages as a result.

## FOURTH CLAIM FOR RELIEF
### (Breach Of Contract)
### (Against SAU)

74.     The allegations in paragraphs 1 through 73 are incorporated by reference.

75.     Dr. McPhail and SAU entered into binding written and other contracts as alleged

herein, including the Employment Agreement.

76.     SAU breached the Employment Agreement and other agreements, as alleged herein

and including by terminating Dr. McPhail's employment for unlawful and false reasons.

77.     Dr. McPhail is entitled to recover all damages incurred, with prejudgment interest,

resulting from SAU's contract breaches.

## FIFTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith & Fair Dealing)
### (Against SAU)

78.     The allegations in paragraphs 1 through 77 are incorporated by reference.

79.     Dr. McPhail entered into valid and binding contracts with SAU.

80.     Implied in each of the contracts is a covenant that SAU would act in good-faith and

deal fairly with Dr. McPhail.

81.     SAU did not act in good-faith and/or make reasonable efforts to perform its

obligations under the contracts for all of the reasons alleged herein.

82.     SAU has otherwise breached the implied covenant of good-faith and fair dealing.

83.     Dr. McPhail is entitled to recover all damages incurred, with prejudgment interest,

resulting from SAU's breach of the implied covenant of good-faith and fair dealing.

## SIXTH CLAIM FOR RELIEF
### (North Carolina Wage & Hour Act)
### (Against All Defendants)

84.     The allegations in paragraph 1 through 83 are hereby incorporated by reference.

85.     The provisions of Article 2A of North Carolina General Statutes Chapter 95 apply to Dr. McPhail's employment with SAU.

86.     Payments under the contracts and payments of other monies identified herein constitute wages within the meaning of N.C. Gen. Stat. § 95-25.2(16).

87.     At all relevant times, SAU and the Individual Defendants were Dr. McPhail's "employer" for purposes of N.C. Gen. Stat. § 95-25.2(5).

88.     SAU's failure to pay Dr. McPhail the full wages and other monies owed to her, including as alleged herein, constitutes a violation of N.C. Gen. Stat. § 95-25.6.

89.     Dr. McPhail is entitled to recover, among other things, such wages that are due to her at the time of judgment, with prejudgment interest from the date they became due.

90.     Pursuant to N.C. Gen. Stat. § 95-25.22(a1), Dr. McPhail is further entitled to recover liquidated damages equal to the amount of wages and other monies due to her.

91.     Pursuant to N.C. Gen. Stat. § 95-25.22(d), Dr. McPhail is further entitled to recover her costs and reasonable attorneys' fees in this action.

## SEVENTH CLAIM FOR RELIEF
### (Tortious Interference With Contractual Relations)
### (Against The Individual Defendants)

92.     The allegations in paragraphs 1 through 91 are incorporated by reference.

93.     Dr. McPhail entered into a valid and binding contractual and/or other relationship in conjunction with her employment, as well as other valid and binding contractual and/or other relationships concerning compensation, as alleged herein.

13

94.    As a third party to the contractual and/or other relationships alleged herein, the Individual Defendants used their respective positions to have SAU refuse to honor its contractual and/or other relationships with Dr. McPhail, thereby unlawfully interfering with the rights between SAU and Dr. McPhail.

95.    Binding contracts existed between SAU and Dr. McPhail.

96.    The Individual Defendants knew of the binding contracts between SAU and Dr. McPhail.

97.    The Individual Defendants intended to induce SAU to breach the binding contracts.

98.    The Individual Defendants acted maliciously, without justification, and for the purpose of having SAU breach the binding contracts with Dr. McPhail.

99.    SAU breached the binding contracts with Dr. McPhail.

100.    The Individual Defendants' actions were the cause of the contract breaches.

101.    Dr. McPhail has suffered damages as a result.

## EIGHTH CLAIM FOR RELIEF
### (42 U.S.C. § 1981)
### (Against SAU)

102.    The allegations in Paragraphs 1 through 101 are incorporated by reference.

103.    At all relevant times, SAU is and was an entity covered by 42 U.S.C. § 1981 ("Section 1981").

104.    Dr. McPhail performed her job in a satisfactory manner at all relevant times pursuant to the Employment Agreement and otherwise, and did not otherwise breach the Agreement.

14

105.    SAU engaged in conduct and practices – including, but not limited to, breaching the Agreement; terminating the Agreement; and/or failing to renew the Agreement -- that were unlawful under Section 1981.

106.    SAU intentionally discriminated against Dr. McPhail because of her race by, among other things, breaching the Agreement; terminating the Agreement and/or failing to renew the Agreement.

107.    There were no legitimate, non-discriminatory reasons for the racial discriminatory conduct and practices employed by SAU against Dr. McPhail.

108.    SAU engaged in a pattern and practice of unlawful conduct designed to harm Dr. McPhail because of her race.

109.    As a direct, foreseeable and proximate result of SAU's unlawful acts, Dr. McPhail has incurred significant damages.

110.    SAU's conduct, both individually and through its employees and associates, was conducted maliciously, or at a minimum, with reckless disregard to Dr. McPhail's federally protected rights under Section 1981.

111.    Dr. McPhail is entitled to all appropriate monetary and other damages from SAU based upon its Section 1981 violations.

**NINTH CLAIM FOR RELIEF**
**(42 U.S.C. § 1981 – Retaliation)**
**(Against SAU)**

112.    The allegations in Paragraphs 1 through 111 are incorporated by reference.

113.    Dr. McPhail engaged in protected activity under Section 1981, including as alleged herein.

15

114. After Dr. McPhail engaged in Section 1981 protected activity, SAU retaliated against her for engaging in such conduct, including by breaching the Agreement; terminating the Agreement; and/or not renewing the Agreement.

115. SAU's retaliatory conduct deprived Dr. McPhail of her federally protected rights under Section 1981.

116. But for Dr. McPhail's protected activity under Section 1981, SAU would not have breached the Agreement; terminated the Agreement; and/or not renewed the Agreement.

117. SAU's conduct, both individually and through its employees and associates, was conducted maliciously, or at a minimum, with reckless disregard to Dr. McPhail's Section 1981 rights.

118. Dr. McPhail is entitled to all appropriate monetary and other damages from SAU based upon its Section 1981 retaliation.

WHEREFORE, Dr. McPhail respectfully requests the following relief:

    a. Judgment against all Defendants, jointly and severally for compensatory damages in an amount in excess of $75,000 plus interest as allowed by law and to be more particularly determined at trial;

    b. Judgment against all Defendants, jointly and severally, for punitive and/or liquidated damages in an amount in excess of $75,000 plus interest as allowed by law and to be more particularly determined at trial;

    c. That she recover from Defendants, jointly and severally, the reasonable costs of attorneys' fees incurred in the prosecution of this action, plus interest as allowed by law;

    d. That all costs of this action be taxed against Defendants;

16

e.      That all issues in this case be tried by a jury; and

f.      For such other and further relief that the Court deems appropriate.

Respectfully submitted this 29th day of April, 2025.

**EDWARDS BEIGHTOL, LLC**

*/s/ Nicholas J. Sanservino, Jr.*
Nicholas J. Sanservino, Jr.  (N.C. Bar No. 36557)
 Of Counsel
1033 Oberlin Road, Suite 100
Raleigh, N.C.  27605
Telephone:   (919) 636-5100
Email:        njs@eblaw.com
*Attorneys for Plaintiff*

17